# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-3001

GARY SPANO, *et al.*,

*Plaintiffs-Appellees*,

*v.*

THE BOEING COMPANY, *et al.*,

*Defendants-Appellants*.

No. 09-3018

PAT BEESLEY, *et al.*,

*Plaintiffs-Appellees*,

*v.*

INTERNATIONAL PAPER COMPANY, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Southern District of Illinois.
Nos. 06-0743-DRH and 06-0703-DRH—**David R. Herndon**, *Chief Judge.*

ARGUED MAY 27, 2010—DECIDED JANUARY 21, 2011

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Employer-supported, defined-contribution plans, including those commonly known as 401(k) plans, play a vital role in the retirement planning of millions of Americans. The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* uses the following definition for such a plan:

> The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

ERISA § 3(34), 29 U.S.C. § 1002(34). In the cases we have before us, we must decide whether complaints challenging the practices of two such plans were properly certified as class actions.

In *Spano, et al. v. The Boeing Company, et al.*, No. 09-3001, the plaintiffs complain that Boeing breached its fiduciary duties to participants in The Boeing Company Voluntary Investment Plan (the "Boeing Plan"). Specifically, their brief in this court asserts that the various defendants associated with the Boeing Plan violated those enhanced responsibilities "in three general respects: [1] causing the Plan to pay excessive fees and expenses, both through contract fees and revenue sharing payments from mutual funds included in the Plan; [2] including imprudent investment options in the Plan; and [3] concealing from participants material information regarding Plan

fees and expenses and Plan investment options." Br. for Appellees, No. 09-3001, at 4. Several participants in the Boeing Plan (to whom we refer as the Spano plaintiffs, after lead plaintiff Gary Spano) sued The Boeing Company, the Employee Benefits Plans Committee, Scott M. Buchanan (Director of Benefits Delivery for the Boeing Plan), and the Employee Benefits Investment Committee, individually and as representatives of an alleged class, seeking relief under ERISA §§ 409, 502(a)(2) and (3), 29 U.S.C. §§ 1109, 1132(a)(2) and (3). (We refer to these defendants collectively as "Boeing" unless the context requires otherwise.) After considerable procedural activity had taken place, the district court granted the plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23(b)(1). Boeing asked this court to accept an appeal from that decision, as we are entitled to do under Rule 23(f). We agreed to do so.

At approximately the same time, a nearly identical lawsuit was proceeding before the same district court judge on behalf of participants in two defined-contribution plans sponsored by the International Paper Company. A group of individual plaintiffs led by Pat Beesley sued International Paper, the International Paper 401(k) Committee, the International Paper Fiduciary Review Committee, and a group of individual defendants who were involved with the operations of the 401(k) plans. (We refer to these defendants collectively as "IP.") Although International Paper offered two defined-contribution plans, one known informally as the Hourly Plan and the other as the Salaried Plan, everyone agrees that there is no material difference between the two, and so

our discussion does not distinguish between them. Like their counterparts in the Boeing litigation, the Beesley plaintiffs accused IP of "causing the Plans to pay excessive fees; maintaining imprudent investment options in the Plans; and miscommunicating to participants about Plan investment options." Br. for Appellees, No. 09-3018, at 5. The district court, in an order entered on the same day as the one it issued in the Boeing case, certified an identical class under Rule 23(b)(1). IP also filed a request for interlocutory review under Rule 23(f); we granted that request and consolidated the two cases together for disposition.

The class definitions adopted by the district court in each of these cases are the same in all material respects. For convenience, we set forth only the description of the class that was certified in the Boeing litigation:

> All persons, *excluding the Defendants and/or other individuals who are or may be liable for the conduct described in this Complaint*, who are or were participants or beneficiaries of the Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

(Emphasis in original.) A primary assertion in both Boeing's and IP's appeals is that this class definition fails to meet the standards of Rule 23(c)(1)(B), which requires an order certifying a class to "define the class and the class claims, issues, or defenses . . . ." FED. R. CIV. P. 23(c)(1)(B). This definition, they argue, is so diffuse as to be no definition at all. In addition, both sets of

defendants assert that the district court erred when it concluded that this class met the criteria of Rule 23(a) (in particular, the commonality, typicality, and adequacy requirements—numerosity is conceded), and when it found that this case should be treated as a mandatory class action under Rule 23(b)(1), either because individual treatment risked the establishment of inconsistent standards of conduct for the defendants, FED. R. CIV. P. 23(b)(1)(A), or because individual cases would, as a practical matter, be dispositive of the claims of non-parties, FED. R. CIV. P. 23(b)(1)(B).

The submissions of both sides bring to mind the phenomenon of ships passing in the night. The Spano and Beesley plaintiffs insist that they are raising common questions that are perfectly suited for class treatment and accuse Boeing and IP of taking the position that class treatment is *never* permissible for a defined-contribution plan, since each employee chooses which instruments to include in his or her account and how much to invest. Neither the plaintiffs nor the district court spent much time defending the actual class that the district court certified. The defendants, for their part, protest that they would not dream of taking any such rigid position, but by the time they have finished cutting away at the plaintiffs' assertions, it is hard to see what is left. Both sides have support from *amici curiae*: the Secretary of Labor and a consortium including the American Association of Retired Persons, the Pension Rights Center, and the National Senior Citizens Law Center support the plaintiffs, while the Chamber of Commerce of the United States supports the defendants.

In order to sort all of this out, we begin with one critical observation: our task is to review only the class certification orders issued by the district court in these two cases. We are not here to review any or all hypothetical orders that the court might have crafted. Our opinion therefore steers away from absolute statements of any kind, either to the effect that all of these cases are inherently class actions, or that none of them is. On that understanding, we examine both the substantive law on which the plaintiffs are relying and Federal Rule of Civil Procedure 23. With that background in place, we turn to the question whether these two orders can stand, or if they must be vacated.

## I

As we noted earlier, this suit arises under ERISA, and in particular section 502(a)(2), 29 U.S.C. § 1132(a)(2). The plaintiffs also allude to section 502(a)(3), 29 U.S.C. § 1132(a)(3), however, and so we set forth most of subpart (a) in the interest of providing the necessary context:

> (a) Persons empowered to bring a civil action
>
> A civil action may be brought—
>
> (1) by a participant or beneficiary—
>
>> (A) for the relief provided for in subsection (c) of this section, or
>>
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; . . . .

ERISA § 502(a), 29 U.S.C. § 1132(a). Focusing for now on section 502(a)(2), we find a cross-reference to the part of the statute codified at 29 U.S.C. § 1109, which is ERISA section 409. The critical part appears in section 409(a), the pertinent part of which reads as follows:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

ERISA § 409(a), 29 U.S.C. § 1109(a).

Notably, it is only section 502(a)(2) that gives a participant a right to sue for a breach of fiduciary duty. Section 502(a)(1) provides the authority to sue to recover

benefits, and section 502(a)(3) focuses on the right to obtain equitable relief for violations of ERISA or of the plan. Both the Spano plaintiffs and the Beesley plaintiffs alleged breaches of fiduciary duty in their complaints. It is for that reason that most of the attention both in the district court and in this court has appropriately been on subpart (a)(2).

A company establishing a pension plan has a choice of two models: a defined-benefit plan, or a defined-contribution plan. The former plans assure participants whose rights had vested that they will receive a specified payout upon retirement, while the latter plans make no such promise. For many years, most retirement plans took the form of a defined-benefit plan, and this fact is reflected in the earlier Supreme Court decisions in this area. In *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 148 (1985), the Court held that a fiduciary to a defined-benefit plan could not be held personally liable to a plan participant or beneficiary for damages that resulted from improper or untimely processing of benefit claims. (The plaintiff there had no claim under section 501(a)(1) because the plan had already paid all retroactive benefits that were due.) Instead, the Court held, "[T]he entire text of § 409 persuades us that Congress did not intend that section to authorize any relief except for the plan itself." *Id.* at 144. Earlier in the opinion, it had explained that the drafters of ERISA "were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Id.* at 142. The key fiduciary duties that the

statute addressed, it added, "relate to the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Id.* at 142-43.

These rules apply in a straightforward way to defined-benefit plans. Employers typically hold a pool of assets in trust for the plan, and that plan is administered by trustees who are fiduciaries with respect to those assets. ERISA § 403(a), 29 U.S.C. § 1103(a); see also ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) (defining fiduciary to include "any administrator, officer, trustee, or custodian"). *Russell* held that section 502(a)(2) applies only if there is a plan-wide breach, although the Court had no need to consider what might amount to injury to the plan outside the context of defined-benefit plans. 473 U.S. at 139-48; see also ERISA § 409(a), 29 U.S.C. § 1109(a) (requiring the fiduciary to "make good to such plan" and to "restore to such plan any profits" in the event that a breach was proven). Restoring funds to the plan, for a defined-benefit plan, assures that the plan will have enough funds to remain actuarially sound. Each participant is affected in the same way by anything that diminishes the fund's assets.

More than twenty years later, the Court found it necessary to decide how these principles apply to defined-contribution plans. In *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248 (2008), it had before it the case of a participant, LaRue, in an ERISA-regulated 401(k) retirement savings plan—that is, a defined-contribution plan—

who alleged that the plan's fiduciaries had failed to carry out his directions to make certain changes to the investments in his individual account. That failure, LaRue asserted, depleted his interest in the plan by approximately $150,000 and amounted to a breach of fiduciary duty. As relief, he sought an order requiring the fiduciaries to restore the $150,000 to the plan's assets that were designated for his account. Both the district court and the court of appeals thought that the defendants (the employer and the plan) were entitled to judgment on the pleadings. They reasoned that any relief that LaRue might receive would be personal to him, rather than on behalf of the plan as a whole, and thus that *Russell* barred his action.

The Supreme Court saw matters otherwise. It began by assuming that the defendants had breached their fiduciary obligations and that those breaches had an adverse impact on the value of the plan assets in LaRue's individual account. It then made the critical statement that "the legal issue under § 502(a)(2) is the same whether [LaRue's] account includes 1% or 99% of the total assets in the plan." *Id.* at 253. That part of ERISA, it noted, "authorizes the Secretary of Labor as well as plan participants, beneficiaries, and fiduciaries, to bring actions on behalf of a plan to recover for violations of the obligations defined in § 409(a)." *Id.* It reviewed those obligations, underscoring that the fiduciary duties under section 409 "relate to the plan's financial integrity and reflect a special congressional concern about plan asset management." *Id.* (quoting *Varity Corp. v. Howe,* 516 U.S. 489, 511-12 (1996)) (internal quota-

tion marks and modifications omitted). LaRue, it then stated, had alleged misconduct that fell "squarely within th[e] category" identified in *Russell* and *Varity*. *LaRue*, 552 U.S. at 253.

The Court recognized that there was language in *Russell* that might have pointed the other way, but it distinguished *Russell* as a case in which the plaintiff had "received all of the benefits to which she was contractually entitled, but sought consequential damages arising from a delay in the processing of her claim." *Id.* at 254. In elaborating on the difference between *Russell* and *LaRue*, the Court stressed the fact that the rules operate somewhat differently, depending on whether the plan uses the defined-benefit or defined-contribution model:

> The "entire plan" language in *Russell* speaks to the impact of § 409 on plans that pay defined benefits. Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan. It was that default risk that prompted Congress to require defined benefit plans (but not defined contribution plans) to satisfy complex minimum funding requirements, and to make premium payments to the Pension Benefit Guaranty Corporation for plan termination insurance. See Zelinsky, 114 Yale L. J., at 475-478.

> For defined contribution plans, however, fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that

> participants would otherwise receive. Whether a
> fiduciary breach diminishes plan assets payable to
> all participants and beneficiaries, or only to persons
> tied to particular individual accounts, it creates the
> kind of harms that concerned the draftsmen of § 409.
> Consequently, our references to the "entire plan" in
> *Russell*, which accurately reflect the operation of § 409
> in the defined benefit context, are beside the point
> in the defined contribution context.

*LaRue*, 552 U.S. at 255-56. It concluded with this holding: "[A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 256.

Shortly after *LaRue* was decided, this court had the occasion to consider its effect on a case brought by participants in the retirement plan for employees of Baxter International. See *Rogers v. Baxter International, Inc.*, 521 F.3d 702 (7th Cir. 2008). Like the plans before us in the present cases, Baxter's plan permitted each participant to exercise some control over the investments in his or her individual account. Again similarly to the plans in our case, the Baxter plan and its trustees limited what investment vehicles the plan would offer to its participants and when trading could occur. One of the funds in which the plan permitted employees to invest was comprised exclusively of Baxter's own stock. On two occasions, however, the value of Baxter's stock dropped. Based at least in part on those incidents, a

plaintiff class sued Baxter and the plan's trustees under ERISA section 502(a)(2), arguing that they had violated their fiduciary duties to the class by continuing to offer the Baxter stock fund as an investment when they knew it was overvalued in the market. After the district court denied the defendants' motion to dismiss on the ground that there was no right of action for losses limited to individual accounts, this court accepted an interlocutory appeal under 28 U.S.C. § 1292(b). We held the case until *LaRue* was released. At that point, we acknowledged that *LaRue* held "that § 502(a)(2), and thus § 409(a), may be used by the beneficiary of a defined-contribution account that suffers a loss, even though other participants are uninjured by the acts said to constitute a breach of fiduciary duty." *Rogers*, 521 F.3d at 705. We remanded for further proceedings, underscoring the fact that our holding was limited to a finding that a right of action for individual plan participants exists in theory under section 502(a)(2) and alerting the district court to a number of hurdles the plaintiffs had yet to clear. *Id.* at 705-06. The *Rogers* opinion had nothing to say about the plaintiffs' effort to proceed as a class.

## II

All of that suggests that at a high level of generality the theory that the plaintiffs are advancing in these two cases is a sound one. But we must not get ahead of ourselves. Unlike *LaRue,* which was a case brought on an individual basis, the Spano and Beesley plaintiffs are attempting to proceed as classes. And the propriety of

the district court's order certifying these two classes is the only question presently before us.

While *LaRue* leaves no doubt that plan beneficiaries are entitled to resort to section 502(a)(2) after a breach of fiduciary duty reduces the value of plan assets in their defined-contribution accounts, that tells us very little about whether or under what circumstances employees resorting to section 502(a)(2) may properly proceed as a class under Federal Rule of Civil Procedure 23. To determine whether class treatment is appropriate, we must distinguish between an injury to one person's retirement account that affects only that person, and an injury to one account that qualifies as a plan injury. The latter kind of injury potentially would be appropriate for class treatment, while the former would not.

We know from *Russell* that a plan's failure to process a particular claim properly or promptly falls in the former category, at least where the plan eventually pays everything to which the employee is entitled. If the benefits are never paid, such a person would presumably be entitled to sue under section 502(a)(1). The Ninth Circuit's decision in *Wise v. Verizon Communications Inc.*, 600 F.3d 1180, 1189-90 (9th Cir. 2010), describes another individual injury, suffered when a fiduciary allegedly mishandled a claim under a long-term disability plan.

The latter kind of injury—one that has a plan-wide effect, in the sense that the loss of benefits occurring in one account diminishes the plan assets as a whole— is well described in one of our pre-*LaRue* decisions,

*Harzewski v. Guidant Corp.*, 489 F.3d 799 (7th Cir. 2007). There we considered a case in which employees of Guidant Corporation complained that the price of Guidant stock in their defined-contribution plan had been inflated by a fraud committed by the company's managers. After concluding (consistently with *LaRue*) that participants who had retired and cashed out their plan benefits were entitled to sue under section 502(a)(2), we explained how those participants might have been injured by a breach of fiduciary duty on Guidant's part. If, we said, "Guidant by imprudent management caused the account to be half as valuable as it would have been under prudent management," then the employees would have been injured to that extent. 489 F.3d at 804. Another situation in which the plan as a whole is injured at the same time as the individual employee arises when the entity responsible for investing the plan's assets charges fees that are too high. Inflated fees leave less money left over for investing in shares of stock, or mutual funds, or bonds, or whatever else the plan has offered. At year's end, and at career's end, the employee's portfolio will be worth less because plan assets were burned up in transaction costs. Finally, there could be situations in which the plan has been reckless in its selection of investment options for its employees, offering nothing but junk-rated bonds or highly leveraged packages. One might say that employees are never forced to participate in the plan sponsored by their employer, but such a statement would prove too much. ERISA encourages employers to support retirement funds; many employers dangle the

carrot of employer matching at some level; and em-
ployees have a statutory entitlement to fiduciary care
from their plans.

The question whether to certify a class asserting
section 502(a)(2) claims is, however, a complex one if
the underlying plan takes the defined-contribution form.
Consider, for example, the circumstances of *LaRue* itself.
One of the employee's rights under the plan in that
case was to choose among the investment vehicles offered
by the plan and to shift money around as he wished,
in accordance with specified procedures. The plan, how-
ever, did not carry out his instructions, and so he
earned $150,000 less than he would have if his funds
had been shifted to a more profitable investment. It is
not at all clear that his injury, even though it affected
the plan as a whole, was shared by any other participant
in that plan. Perhaps no one else was interested in the
same funds. Maybe all other instructions were carried
out promptly. In either of those two situations, class
treatment seems out of the question. If, however, the
plan fiduciaries had simply stopped implementing all
investment directions for a period of time, then it is
more likely that a class could be formed. The propriety
of class treatment thus will turn on the circumstances
of each case.

To determine whether the Spano and Beesley plaintiffs
may proceed as a class, we must therefore turn from the
law of ERISA to Rule 23 of the Federal Rules of Civil
Procedure, to see whether the district court abused
its discretion by certifying the class it defined. (We recog-

nize that the parties do not agree whether the normal abuse-of-discretion standard applies here, see *Andrews v. Chevy Chase Bank,* 545 F.3d 570, 573 (7th Cir. 2008), or whether a more stringent *de novo* standard is appropriate because pure legal questions underlie the court's decision. We see little practical difference in the two standards for this case, and so we will use the normal abuse-of-discretion approach.) In order to go forward, the proposed class must meet the four prerequisites set forth in Rule 23(a), and it must fall within one of the three general categories recognized by Rule 23(b).

While Rule 23 is well known to litigation specialists, it is worth reviewing exactly what it requires before proceeding to decide this case. The relevant part of the rule reads as follows:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

FED. R. CIV. P. 23. In short, all classes must satisfy the Rule 23(a) criteria of numerosity, common questions of law or fact, typicality of claims or defenses, and adequacy of representation. If they do, then they must also be either (1) a mandatory class action (either because of the

risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior.

Before certifying a class, the district court must do more than review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case seems suitable for class treatment. We expressly disapproved of this approach in *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). As we explained there, "[A]n order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional). Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. If some of the determinations required by Rule 23 cannot be made without a look at the facts, then the judge must undertake that investigation.

At the end of that process, if the court concludes that class certification is proper, it must issue a certification order. For present purposes, the most important part of that order is the place where it defines the class. See FED. R. CIV. P. 23(c)(1)(B). This is a vital step. Both the scope

of the litigation and the ultimate *res judicata* effect of the final judgment depend on the class definition. If the unnamed members of the class have received constitutionally adequate representation, then the judgment in the class action will resolve their claims, win or lose. See *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867 (1984).

The Third Circuit faced a case quite similar to ours in *In re Schering Plough Corporation ERISA Litigation*, 589 F.3d 585 (3d Cir. 2009), and we find much of its reasoning helpful. In *Schering*, Wendel, a former employee of Schering-Plough who participated in its defined-contribution plan, wanted to bring a class action against Schering-Plough and some of its officers and directors under ERISA section 502(a)(2). The plan used the familiar self-directed individual account; it permitted participants to choose among a variety of investment funds, including the Schering-Plough Stock Fund, and to contribute up to 50% of their pre-tax compensation to one or more funds. This case was another stock-drop case, filed after the value of Schering-Plough declined significantly over two years (from $60 per share to less than $20 per share). The district court certified the following class: "[A]ll persons who were participants in or beneficiaries of the Schering-Plough Corporations Employees' Savings Plan at any time between July 29, 1998 to the present and whose accounts included investments in Schering stock." *Id.* at 593.

After concluding that a release that Wendel had signed upon leaving Schering was not void under ERISA

section 410, the court turned to the question of the release's effect on her ability to serve as a class representative. The release, it concluded, affected only any individual claim that Wendel might have brought against Schering. But a claim under section 502(a)(2) went well beyond that, it held: "Section 502(a)(2) claims are, by their nature, plan claims." *Id.* at 594. If the right of action belongs to the plan, then only one who is entitled to speak for the plan could release it; Wendel's individual release could have no such effect. *Id.* at 595.

That conclusion, however, merely cleared the way to the court's consideration of both the propriety of the class certification and Wendel's ability to serve as a class representative. The court found no problem with either the numerosity element (over 10,000 people participated in the Schering-Plough Stock Fund) or commonality. Among the common questions of law or fact that it identified were these: whether the defendants were fiduciaries; whether they breached their duties to the plan by failing to conduct an appropriate investigation into the soundness of Schering's stock; whether they breached their duties by continuing to invest in Schering stock too long; whether they failed adequately to monitor the plan's investment committee defendants; whether they erred by failing to hire independent fiduciaries; and whether their breaches caused plan losses. *Id.* at 597. It was with typicality and adequacy of representation that Wendel's class failed. Although Wendel's legal claims appeared to be identical to those of the class she sought to represent, the release that she signed gave rise to a possible defense that was

unique to her; indeed, it was possible that she might
not have a monetary stake in the outcome at all. The
court was also concerned that the record showed
nothing about how many others in the putative class
might have signed comparable releases. *Id.* at 599-600.
With respect to adequacy, although the court had no
qualms about counsel's competence to handle the case,
it thought that Wendel might have different incen-
tives from her fellow class members and thus a different
willingness to pursue the litigation. *Id.* at 602. Finally, the
court accepted the defendants' argument that the
temporal scope of the class was not adequately defined.
*Id.* at 602-03. For these reasons, it vacated the class certif-
ication and remanded for further proceedings. Before
concluding, it commented that the class appeared to be
a good candidate for mandatory treatment under Rule
23(b)(1)(B), since "Wendel's proofs regarding defendants'
conduct will, as a practical matter, significantly impact
the claims of other Plan participants . . . ." *Id.* at 604.

**III**

A.  Spano

We are now in a position to resolve the direct ques-
tions before us: whether the Spano and Beesley classes
were properly certified. We address first the Spano class.
As we noted earlier, after concluding that the require-
ments of Rule 23(a) were satisfied, the district court
went on to find that this was amenable to treatment as
a mandatory Rule 23(b)(1) class; it apparently meant to
use (b)(1)(B), since it mentioned that adjudications of

the representative plaintiffs' cases "would, as a practical matter, be dispositive of the interests of the other participants claims [*sic*] on behalf of the Plan," and that "separate actions by individual plaintiffs would impair the ability of other participants to protect their interests if the suit proceeded outside of a class context." Although Boeing's brief has emphasized its objections to the district court's use of Rule 23(b)(1), we think it best to begin with Rule 23(a) (as the Third Circuit did in *Schering*) and to proceed as needed from there.

No one has argued that the class defined by the district court failed the numerosity requirement, nor could anyone take that position with a straight face. As the district court pointed out, Boeing's 2004 filings with the Department of Labor on behalf of the Boeing Plan disclosed that there were 189,577 participants with account balances. We therefore move directly to the other three requirements under Rule 23(a).

Rule 23(a)(2) does not demand that every member of the class have an identical claim. It is enough that there be one or more common questions of law or fact; supplemental proceedings can then take place if, for example, the common question relates to liability of the defendant to a class and separate hearings are needed to resolve the payments due to each member. The district court highlighted two such common questions in Spano's case: (1) the allegedly imprudent choice of the investment options included as part of the Boeing Plan, and (2) the reasonableness of the administrative fees that Boeing charged to all participants. On appeal,

Spano adds a third point: an alleged failure to describe the investment options accurately in materials distributed to the participants. Boeing insists that although these might have been common questions if the Boeing Plan had offered defined benefits, they lose that character for a defined-contribution plan. Each individual participant's account reflects that person's choices among the 11 options Boeing has offered since 1997. This fact, Boeing says, destroys any commonality that might exist.

Boeing's argument, in our view, proves too much. By focusing exclusively on the final step of the defined-contribution plan—that is, the participant's decisions with respect to the allocation of his or her funds—it ignores the fact that fund participants operate against a common background. As the Secretary of Labor emphasizes, the logic of *LaRue* compels the conclusion that there might be plan losses in a defined-contribution setting, and at least some of those losses might be of the type that do not vary from participant to participant. The assertion that Boeing imposes excessive fees on all participants, as well as the assertion that Boeing has failed to satisfy its fiduciary duties in its selection of investment options, both describe problems that would operate across the plan rather than at the individual level *Cf. Hecker v. Deere & Co.*, 556 F.3d 575, 584-87 (7th Cir. 2009) (noting that the record showed sufficient variety in investments and fee levels to satisfy ERISA requirements). We thus conclude, as did our colleagues in *Schering*, that the class met the commonality requirement of Rule 23(a)(2).

Matters become more difficult when we turn to the typicality requirement of Rule 23(a)(3). The class definition adopted by the district court is breathtaking in its scope. Anyone, in the history of Time, who was ever a participant in the Boeing Plan, or who in the future may become a participant in the Boeing Plan, is swept into this class, if he or she "may have been affected by the conduct set forth in this Complaint." Our starting point for purposes of the typicality question is the Supreme Court's decision in *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147 (1982). In that case, the Court found that a putative class representative who asserted that he had been the victim of national-origin discrimination in promotion did not have a claim that was common with, and typical of, others who had suffered discrimination in hiring. *Id.* at 158-59. (The Court noted in passing that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Id.* at 157 n.13.) The lesson we take from that is that there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group.

Unfortunately, we cannot even assess that question rationally for the class that the district court defined. Reading the plaintiffs' brief, it appears that one of their particular objections is to the fact that Boeing included a Technology Fund and the Boeing Stock Fund as two of its investment options. But many participants in the past (and who knows about the future) never held a single share in either or both of those funds. It is inter-

esting in this connection to contrast the *Spano* class definition with the one the Third Circuit found defective in *Schering*: there, at least, the class was limited to people whose accounts included Schering stock. In keeping with the teachings of *General Telephone*, it seems that a class representative in a defined-contribution case would at a minimum need to have invested in the same funds as the class members. It is entirely possible, after all, that out of the 11 options a particular plan might offer, 10 were sound and one was ill-advised and should never have been offered. We are not saying that this is the case with the Boeing Plan; we take no position on that issue. But the possibility cannot be ruled out, and thus we think that there must be a congruence between the investments held by the named plaintiff and those held by members of the class he or she wishes to represent.

The same concerns arise again when we consider adequacy of representation. Like the district court, we have no reason to question the competence of the lawyers who are representing the class. But adequacy of representation implicates more than that. Indeed, there is a constitutional dimension to this part of the inquiry; absentee members of a class will not be bound by the final result if they were represented by someone who had a conflict of interest with them or who was otherwise inadequate. See *Richards v. Jefferson County, Ala.*, 517 U.S. 793 (1996); *Hansberry v. Lee,* 311 U.S. 32 (1940). The district court dismissed these concerns by repeating the observation that the class was complaining about the structure of the plan as a whole. That is an insuf-

ficient answer, however, to the assertion that many members of the class have no complaint about those funds, in light of the dates when they first invested and the date when they exited. It is not enough to say that the named plaintiffs want relief for the plan as a whole, if the class is defined so broadly that some members will actually be harmed by that relief.

Since the Spano class as presently defined does not meet the criteria of Rule 23(a), we could leave it at that. But since this is an interlocutory appeal and there is nothing to prevent the plaintiffs from asking the district court to certify a more-targeted class (or perhaps more than one more-targeted class), we think it desirable to address Rule 23(b) as well (which, incidently, occupied the bulk of Boeing's attention in its briefs). The leading Supreme Court decision on Rule 23(b)(1)(B) is *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Although the immediate focus of the Court's attention was a proposed settlement class in the seemingly eternal asbestos litigation, its analysis otherwise applies to all class actions. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997) (pointing out that while there is no need to be concerned with trial management issues when evaluating a settlement class, all other parts of Rule 23 "demand undiluted, even heightened, attention").

In *Ortiz*, the Supreme Court cautioned strongly against overuse of (b)(1) classes. 527 U.S. at 841-48. It contrasted the mandatory nature of (b)(1) classes with the features of (b)(3) classes, under which notice to all class

members is required, see FED. R. CIV. P. 23(c)(2)(B), and those notified have a right to opt out of the class if they so desire, see FED. R. CIV. P. 23(b)(2)(B)(v). See *Ortiz*, 527 U.S. at 846-48 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)). The *Ortiz* Court also paid heed to the command in the Rules Enabling Act, 28 U.S.C. § 2072(b), that the rules of procedure "shall not abridge, enlarge or modify any substantive right." See *Ortiz*, 527 U.S. at 845. Too liberal an application of the mandatory-class device risks depriving people of one of their most important due process rights: the right to their own day in court. *Id.* at 846. The primary issue in *Ortiz*—whether the district court had properly identified a limited fund—is not implicated here, but the decision's broader teachings operate with full force.

In *Schering*, the Third Circuit thought that it was fairly easy to conclude that the plaintiffs had presented a case that met the criteria of Rule 23(b)(1)(B) (if on remand they could cure their 23(a) problems). But the class definition was limited to persons who had invested in the Schering stock fund, and the allegation was a very specific one, that the stock was overvalued because of undisclosed problems with the company's regulatory compliance systems and delays in the release of a major new product. We have no need to decide whether, under those circumstances, we might endorse the use of Rule 23(b)(1)(B), because Spano's case is so different. It is not enough to say, as the plaintiffs do here, that they have asserted a common and undivided interest in plan performance that was harmed by Boeing's conduct. Saying so does not make it so.

Focusing only on the class that the district court actually certified, we cannot find the necessary identity of interest among all class members. A claim of imprudent management, for example, is not common if the alleged conduct harmed some participants and helped others, which appears to be the case. Without the common interest, there is no reason to assume that an adjudication of one person's claim "as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1)(B). The plaintiffs fare no better under Rule 23(b)(1)(A), to which they also appeal (even though the district court does not seem to have been relying on it). That part of the rule is concerned with the risk of inconsistent or varying adjudications that might establish incompatible standards of conduct for the defendant. The plaintiffs assume that Boeing could not simultaneously offer the Technology Fund to some people and not to others, but we do not see why that would be a problem. Should that ultimately be required, Boeing would simply have to divide its plan into one or more sub-plans.

Nothing we have said should be understood as ruling out the possibility of class treatment for one or more better-defined and more-targeted classes. Whether, for such a class or classes, the strict requirements of Rule 23(b)(1) can be met will depend on the new class definitions. We are also not in a position to guess whether any new class might be suitable for treatment under Rule 23(b)(2), which also permits class treatment

without mandatory notice and opt-out rights, but only if the ultimate relief will be an injunction or corresponding declaratory relief. Otherwise, the district court will be free to decide whether a common-question class action under Rule 23(b)(3) may go forward.

## B. Beesley

Much of what we have said about the Spano class applies with equal force to the Beesley class. The definition endorsed by the district court was identical to the one in the Spano class, except that instead of referring simply to "the Plan," it said "the Salaried Plan or the Hourly Plan," reflecting the fact that the suit related to the two plans that IP sponsored. As in Spano, no one contests the fact that the plaintiffs have met the numerosity requirement of Rule 23(a)(1); the two IP plans had approximately 71,291 participants as of 2006. IP's challenges to the commonality requirement of Rule 23(a)(2) mirror those presented by Boeing. For example, IP takes the position that the individual nature of each participant's investment decisions, and also the individual response each person might have had to the alleged misrepresentations, preclude a finding that common questions of law or fact exist. But this assumes that every question must be common, and, as we have discussed, that is not what Rule 23(a)(2) demands. The plan-wide communications about which the Beesley plaintiffs complain either were or were not misleading. Whether the fees charged by the plans were excessive (either on their own, or as a result of the fee structures

the plans used) also is common to all class members, at least to the extent that their objection is to plan-wide fees. Finally, the package of investment options offered by each plan was the same for every participant. The question whether that package was prudent, in light of ERISA's standards, is a common one.

The Beesley plaintiffs, like their counterparts, encounter trouble when they reach the typicality and adequacy inquiries of Rule 23(a)(3) and (a)(4). Recall that the plaintiffs are pursuing three general theories: (a) misrepresentation; (b) imprudent investment; and (c) excessive fees. We address them in that order.

It is hard to be sure exactly what misrepresentation claims have been certified (this is another flaw with the district court's order). The Beesley plaintiffs appear to identify two types of misrepresentations: first, fraudulent concealment of the imprudence of the IP Stock Fund and the Large Cap Stock Fund; and second, concealment of the conflict of interest that arose from the close relationship between IP and JPMorgan, the manager of most of its funds. IP, for its part, has identified four misrepresentation allegations: the use of a deliberately misleading benchmark (the S&P 500 Stock Index) for the Large Cap Stock Fund; the use of deliberately misleading benchmarks (the S&P Paper and Forest Products Index and the S&P 500 Materials Index) for the IP Stock Fund; the publication of fraudulent reconstructed returns for IP's newly pooled funds; and the deliberate description of the return potential for the IP Stock Fund as high, at the same time as IP was unloading this stock

for the corporate defined-benefit plan. It is not for us to say whose description of the issues is correct. The district court, however, should have clarified what issues it was certifying and why Beesley's claim was typical for these purposes.

IP has made a more ambitious argument: it says that these misrepresentation theories are inherently personal and can *never* be certified for class treatment. That is because, in IP's view, they require evidence of reliance, and the facts pertaining to reliance will be different for every participant. The district court rejected this argument for two reasons: first, it noted that this court has never expressly held that reliance is an element of a suit under ERISA for breach of fiduciary duty; and second, it thought that the individual questions fell by the wayside since the allegedly misleading communications were distributed plan-wide. It seems possible to us that some misrepresentations might be so central to the operation of a plan that injury to someone who held shares in the affected funds might be inferred. But other arguments, we believe, would require precisely the kind of individualized attention that would make it difficult to find a class representative with claims typical of enough people to justify class treatment. Furthermore, we note that IP has conceded that this would be a different case if the plaintiffs were seeking only prospective injunctive relief to correct a misstatement. See *Varity Corp.*, 516 U.S. at 508-12. All we need say at this juncture is that there is no guarantee in the class certified by the district court that Beesley's claims are typical of those of the rest of the group.

The Beesley plaintiffs also argue that the IP Stock Fund and the Large Cap Stock Fund were imprudent investments. IP is willing to admit that claims of excessive risk or artificial inflation may permit class certification, but it contends that the plaintiffs have made no such claims here. As Boeing did, IP points out that any given participant may or may not have chosen to include those funds in his or her portfolio. It should not be blamed, it says, if a person opted to put her money in a riskier or more questionable fund. And more to the point, the close-to-infinite variety of combinations in each participant's account—varying by which investment, when purchases were ordered, when money was shifted from one fund to another—make this claim singularly unattractive for class treatment.

In *Hecker*, we left open the question whether a plan could ever be liable for the selection of investment options in a defined-contribution plan. 556 F.3d at 586-87. In the related cases we are deciding today, *Howell v. Motorola, Inc.* and *Lingis v. Dorazil*, Nos. 07-3837 & 09-2796 (7th Cir. Jan. 21, 2011), we conclude that the answer is yes. See slip op. at 32-35. But the availability of such a claim in theory is not the same as the ability to assert it as a class in a particular case. Here, if a proper class can be constituted on remand with a representative who personally held one or both of the allegedly imprudent funds, the question on the merits would be whether the mere existence of a fund that is undesirable taints the entire plan, or, if more is needed, what would that be? A showing of deliberate misrepresentations about soundness? A showing that

participants had such a small number of options that they were forced into the bad fund? A showing that the menu of options included only, or mostly, imprudent options? Something else? An extra hurdle such a class representative or individual plaintiff would need to surmount in the IP litigation is the fact that IP, like Deere in the *Hecker* litigation, not only offers 12 pooled funds in addition to the IP Stock Fund, but it also makes available a brokerage window into over 11,000 publicly traded mutual funds. IP represents that participants are free to take advantage of any of these, in order to meet their own investment goals.

Finally, the Beesley plaintiffs complain that the IP plans charge excessive administrative fees. IP has conceded that a claim accusing a plan of excessive, plan-wide administrative fees may be suitable for class treatment of some kind. (It has not, however, conceded that the class definition the court used would work for this claim, nor that such a class could be maintained under Rule 12(b)(1).) Even this part of the case is more complicated than it appears to be at first glance. The complaint implies that some fees are fund-specific, while others may be imposed equally on every plan participant. Precision on this point is essential to ensure that the class representative's claim is typical.

As was the case with the Spano class, the class definition provided by the district court in the *Beesley* litigation fails to satisfy the typicality and adequacy requirements of Rule 23(a). As before, nothing we have said rules out the possibility that the district court might be

able to craft a properly defined class. If, when the district court revisits the class certification issue, it concludes that one or more classes can be defined that meet the Rule 23(a) criteria, then it will need to reconsider its analysis under Rule 23(b). Although the plaintiffs have invited us to find on our own that Rule 23(b)(2) or (b)(3) have been satisfied, we decline to do so. Too much is up in the air, and too much work remains to be done in the district court, before any conclusions on that point are possible. Whether Rule 23(b)(1)'s mandatory-class requirements have been satisfied, as we said above, will depend on the new class definition (if any) that the district court devises. As in the *Spano* litigation, nothing we have said is intended to rule out class treatment under Rule 23(b)(2) and (3) on remand.

## IV

Although the Supreme Court's decision in *LaRue* established the fact that a participant in a defined-contribution plan may sue under ERISA section 502(a)(2) for damages to the plan, even if the only place those damages are reflected is in his or her own account, there is much that *LaRue* does not resolve. Importantly, *LaRue* was an individual case, and so it does not answer the question whether, or when, the kind of suit it was addressing may proceed as a class action. In our view, it would be inconsistent with *LaRue* to assume that class actions are impossible in these cases. On the other hand, there is no denying the fact that a greater number of issues will be suitable for class treatment in a defined-

benefit case than will be in a defined-contribution case. There is greater potential for intra-class conflict in the defined-contribution context. For example, a fund that turns out to be an imprudent investment over a particular time for one participant may be a fine investment for another participant who invests in the same fund over a slightly different period. If both are included in the same class, a conflict will result and class treatment will become untenable.

*Ortiz* teaches that short-cuts in the class certification process are not permissible. *General Telephone* stresses the fact that the class representative must, at a meaningful level of detail, stand in the same position as the absentee members of the class. And once the court has completed its analysis under Rule 23(a) and (b), it must craft a definition of the class that assures that the action will not drift beyond the boundaries the court has drawn. The district court in these cases certified classes that were defined so broadly that the requirements of Rule 23(a) cannot be met. Accordingly, additional proceedings to consider the requirements of both Rule 23(a) and Rule 23(b) are required. We therefore VACATE the district court's order certifying the classes in both *Spano,* No. 09-3001, and *Beesley,* No. 09-3018, and REMAND for further proceedings consistent with this opinion.